## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| L. DUANE WILSON,                          ) | |
| HELEN L. WILSON,                          ) | |
|                                          ) | |
|     **Plaintiffs,**        ) | |
|                                          ) | |
| **v.**                                     )  **Case No. 21-CV-0062-CVE-SH** | |
|                                          ) | |
| **STATE FARM FIRE AND**             ) | |
| **CASUALTY COMPANY,**              ) | |
|                                          ) | |
|                                          ) | |
|     **Defendant.**        ) | |

## <u>OPINION AND ORDER</u>

Before the Court are defendant's motion for partial summary judgment (Dkt. # 22); plaintiffs'

response (Dkt. # 32); defendant's reply (Dkt. # 42); defendant's motions in limine (Dkt. ## 24, 25,

26); plaintiffs' responses to defendant's motions in limine (Dkt. ## 37, 38, 39); defendant's replies

as to its motions in limine (Dkt. ## 46, 48, 49); plaintiffs' motion in limine (Dkt. # 27); defendant's

response to plaintiff's motion in limine (Dkt. # 35); and plaintiffs' reply as to their motion in limine

(Dkt. # 47).  This case arises from an insurance claim dispute regarding the extent of and coverage

for wind and hail damage to plaintiffs' roof.[1]  Dkt. # 2, at 15.  On May 22, 2020, plaintiffs L. Duane

Wilson and Helen L. Wilson filed a petition in the District Court of Tulsa County, Oklahoma (Dkt.

# 2, at 13-20) against defendant State Farm Fire and Casualty Company (State Farm) alleging breach

of contract (count 1) and bad faith (count 2).  Id. at 14-18.  Plaintiffs seek actual and punitive

---

[1]     The subject residence has a main house roof as well as a detached pool house roof, both of
which plaintiffs allege were storm-damaged. Dkt. # 32, at 16.  For purposes of this opinion
and order, the Court will refer to the main house and pool house roofs collectively as "the
roof."

damages based on defendant's alleged breach of contract and bad faith.  Id. at 19.  Consequently, defendant moves, pursuant to Fed. R. Civ. P. 56, for partial summary judgment on plaintiffs' bad faith claim (count 2) and on the issue of punitive damages.  Dkt. # 22.

**I.**

The following facts are not in dispute: plaintiffs' property is insured under State Farm policy number 36-BJ-S690-8.  Dkt. # 22, at 10; Dkt. # 32, at 4.  Plaintiffs' policy covers "accidental direct physical loss[,]" which includes roof damage that directly results from wind and hail.  Dkt. # 22, at 10; Dkt. # 32, at 4.  Further, plaintiffs' policy pays the amount that they "actually and necessarily spend to repair or replace the damaged part of the property," provided that it is covered damage and plaintiffs actually complete the repair or replacement.  Dkt. # 22-2, at 23 (State Farm policy).  On September 20, 2019, plaintiffs submitted a claim to defendant State Farm for wind and hail damage to their roof, alleging a date of loss of May 25, 2019.[2]  Dkt. # 22, at 11; Dkt. # 32, at 5; Dkt. # 22-3, at 3 (State Farm claim file).

Prior to submitting their claim, but after the May 25, 2019 storm that allegedly damaged their roof, plaintiffs asked contractor A-Best Roofing "to inspect the [wood shake] roofs of their home and pool house and advise [p]laintiffs of the condition of those roofs."  Dkt. # 32, at 16; Dkt. # 42, at 6.  A-Best Roofing employee, Samuel Avila, testified that he "did not [specifically] focus on storm damage" during his inspection; notwithstanding, Mr. Avila confirmed that he saw some missing wood shakes, "which is an indication of wind damage," and some hail damage to the roof's metal components.  Dkt. # 42-3, at 2-3, 6.  However, Mr. Avila also confirmed in his deposition that he

---

[2]     The Court notes that the May 25, 2019 storm continued into the early morning hours of May 26, 2019.  Dkt. # 32, at 4.  For purposes of this opinion and order, the Court will refer to the Storm as the May 25, 2019 storm.

found that plaintiffs' wood shake roof was very brittle, had dry rot, was crumbling, and had holes from "burnouts," which he believed were <u>not</u> caused by storm damage, but by "age [and] excess heat."   <u>Id.</u> at 3-4.   Plaintiff L. Duane Wilson confirmed in his deposition that Mr. Avila recommended replacing the entire roof.   Dkt. # 42-4, at 4.

State Farm scheduled an inspection of plaintiffs' roof for September 27, 2019.   Dkt. # 22, at 11; Dkt. # 32, at 5.   That day, State Farm claims specialist (CS) Jeffrey Aleman met with Mr. Wilson at plaintiffs' property, but was unable to complete the inspection.[3]   Dkt. # 22, at 11; Dkt. # 32, at 6. Plaintiffs scheduled a second roof inspection for October 7, 2019, which was performed by State Farm CS Brian Ecklehoff.[4]   Dkt. # 22, at 11; Dkt. # 32, at 7.   CS Ecklehoff "climbed onto [plaintiffs'] roof and took numerous photos documenting its condition."   Dkt. # 22, at 11-12; Dkt. # 32, at 7.   According to CS Ecklehoff's State Farm claim notes, he found "hail damage to valley metals and the metal roof covering two turrets . . . found no hail damage or storm damage to the wood shakes on the roof."   Dkt. # 22, at 12; Dkt. # 22-3, at 27 (State Farm claim notes). Consequently, CS Ecklehoff issued plaintiffs a payment "based on a replacement cost value of

---

[3]     The Court notes that the parties dispute the reason why CS Aleman was unable to complete the inspection: plaintiffs argue that it was because the roof was too steep, Dkt. # 32, at 6; defendants argue that it was because the roof was too wet, Dkt. # 22, at 11.   However, the Court finds that the reason for rescheduling the inspection is not material to plaintiff's bad faith claim and the issue of punitive damages.   "The core of a bad-faith claim 'is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy.'"   <u>Flores v. Monumental Life Ins. Co.</u>, 620 F.3d 1248, 1255 (10th Cir. 2010) (quoting <u>McCorkle v. Great Atl. Ins. Co.</u>, 637 P.2d 583, 587 (Okla. 1981)).   Regardless of whether CS Aleman rescheduled because the roof was too steep or too wet, neither reason is persuasive evidence of unreasonable, bad-faith conduct.

[4]     The Court notes that plaintiffs dispute certain facts as to the October 7, 2019 inspection; however, plaintiffs do not dispute that CS Ecklehoff performed the second roof inspection on October 7, 2019.

damage to [p]laintiffs' property ($25,948.87), minus [p]laintiffs' deductible ($9,635.00) and depreciation costs ($3,116.49), for an actual cash value of $13,197.38."[5] Dkt. # 22, at 12; Dkt. # 32, at 7.

Plaintiffs, believing that State Farm's payment on the claim was insufficient, entered into a contract with a public adjuster firm, Coppermark Consulting Corps, LLC (Coppermark), to "assist [plaintiffs] in the preparation, presentation and settlement" of their insurance claim. Dkt. # 22, at 13 (quoting Coppermark contract, Dkt. # 22-9); Dkt. # 32, at 9. Coppermark's contract states, in pertinent part, "[a]s a public adjuster, Coppermark does not work for any insurance company, but works for the [c]lient." Dkt. # 22-9, at 2. Further, the contract states that Coppermark receives 15% of the total claim amount as payment. Id. In December 2019, Coppermark contacted State Farm and requested plaintiffs' policy documents. Dkt. # 22, at 13; Dkt. # 32, at 9. On February 18, 2020, "Coppermark submitted a Sworn Statement in Proof of Loss with an estimate that [p]laintiffs' claim required replacement of the entire roof at an amount of $361,518.63." Dkt. # 22, at 13; Dkt. # 32, at 10.

After reviewing Coppermark's estimate, "State Farm determined that because there is such a large price difference on the scope of repairs the claim should go back to a field adjuster for

---

[5]     CS Ecklehoff issued payment to plaintiffs for the estimated "actual cash value" of plaintiffs' covered damage, which is based on his estimated replacement cost to repair plaintiffs' covered roof damage. Dkt. # 22, at 12; Dkt # 32, at 7. Per plaintiffs' policy, plaintiffs are entitled to recover the full repair or replacement cost, i.e. the amount plaintiffs "actually and necessarily spend to repair or replace the damaged part of the property," provided that plaintiffs actually complete the repair or replacement. Dkt. # 22-2, at 23 (State Farm policy). Thus, that CS Ecklehoff issued payment for the estimated actual cash value on the date of his inspection does not settle plaintiffs' damage claim. Moreover, plaintiffs dispute that the estimated replacement cost value is merely $25,948.87; rather, plaintiffs allege that the estimated replacement cost value for covered damage is $267,548.87. Dkt. # 32, at 7.

another inspection." Dkt. # 22, at 13 (internal quotations omitted); Dkt. # 32, at 10.  On February

26, 2020, State Farm CS Mark Wood and Team Manager (TM) Carmen Richwine visited plaintiffs'

property and visually inspected (without climbing onto the roof) the roof's elevations.  Dkt. # 22,

at 14; Dkt. # 32, at 10.  Based on their inspection, CS Wood and TM Richwine "did not find any

damage not already included in State Farm's estimate."  Dkt. # 22, at 14; Dkt. # 32, at 10.   A

Coppermark representative was also present at the February 26, 2020 inspection, and CS Wood and

TM Richwine informed the representative that State Farm will retain a third-party engineer to inspect

plaintiffs' roof.  Dkt. # 22, at 14; Dkt. # 32, at 10-11.

State Farm retained third-party engineering firm, EFI Global, Inc. (EFI Global), to inspect

plaintiffs' roof damage.  Dkt. # 22-3, at 22 (State Farm claim file).  EFI Global senior engineer,

Stanton Smith, contacted Coppermark multiple times to schedule his inspection, which was

apparently delayed due to Coppermark personnel changes.  Dkt. # 22, at 14; Dkt. # 32, at 11; Dkt.

# 22-14 (Mr. Smith's email updating State Farm CS Wood as to why scheduling an inspection was

delayed).  "Once the inspection was finally scheduled, it was delayed twice because of rain."  Dkt.

# 22, at 14; Dkt. # 32, at 11.  Mr. Smith was able to inspect plaintiffs' roof on April 8, 2020.  Dkt.

# 22, at 14; Dkt. # 32, at 11.  Mr. Smith conducted the inspection by "climb[ing] a ladder to inspect

portions of the roof , but also climbed on the roof for part of the inspection."  Dkt. # 22, at 14; Dkt.

# 32, at 11.  Additionally, Mr. Smith arranged for drone photographs of plaintiffs' roof to supplement

his inspection.  Dkt. # 32, at 11; Dkt. # 42, at 5.

On May 12, 2020, Mr. Smith submitted his EFI Global report to State Farm concluding that

there was "no hail damage to the wood shakes on the roof or the chimney pots."  Dkt. # 22, at 14-15;

Dkt. # 32, at 11.  Mr. Smith stated in his report that "the scope of [his assessment] was to determine

whether the wood shakes or chimney pots on the subject property had sustained hail damage"; and he determined hail damage based on "whether the water-shedding ability of the roofing had been impaired by hail, or the expected lifespan of the roofing had been reduced by hail." Dkt. # 22-16, at 3. Notably, although plaintiffs claimed wind damage and hail damage, State Farm did not specifically request that Mr. Smith assess the roof for wind damage. Dkt. # 32, at 11; Dkt. # 32-6, at 1 (State Farm letter requesting engineering expert to assess hail damage); Dkt. # 32-7, at 1 (plaintiffs' State Farm claim for wind and hail damage). Consequently, Mr. Smith found that "[a]ll deterioration of shakes in [his] photographs was consistent with age-related deterioration. No shakes on slopes facing any direction had been damaged by hail." Dkt. # 22, at 15; Dkt. # 32, at 12.

On May 22, 2020, "State Farm provided Coppermark with Mr. Smith's report and informed it that the investigation of the claim was concluded." Dkt. # 22, at 15; Dkt. # 32, at 13. "State Farm concluded, based on investigations by State Farm's claims personnel and Mr. Smith's consistent findings, that no wood shakes on [p]laintiffs' roof had been damaged by hail, but the damage to the roof was wear, tear and weathering . . . not covered under the policy." Dkt. # 22, at 15 (internal quotations omitted); Dkt. # 32, at 13. State Farm's May 22, 2020 "partial denial letter . . . makes no reference to the wind damage claimed by [p]laintiffs." Dkt. # 32, at 21; Dkt. # 42, at 7. That same day, plaintiffs filed a petition in state court against defendant State Farm alleging breach of contract (count 1) and bad faith (count 2). Dkt. # 2, at 13-20.

After plaintiffs filed suit, State Farm retained several experts who submitted Fed. R. Civ. P. 26 reports, including: 1) licensed professional engineer Shawn M. Thompson of Engineering Inc. (Dkt. # 22-18); and 2) general contractor Jon Derek VanDorn of Berryman Enterprises, Inc. (Berryman) (Dkt. # 22-20). Plaintiffs also retained experts who submitted Rule 26 reports,

including: 1) licensed professional engineer Carl E. Martin of Engineering Perspective Inc. (EPI) (Dkt. # 25-3); and 2) adjuster Pat Carrell of Maximum Disaster Services, LLC (MDS) (Dkt. # 27-5). Additionally, plaintiffs listed Samuel Avila of A-Best Roofing, and Coppermark's founder and public adjuster for the firm, Greg Cannon, as "non-retained experts" in their Rule 26 disclosures. Dkt. # 24-1, at 5-6.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). "[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery[,]" Fed. R. Civ. P. 56(b), including before any discovery has been conducted. "Movants for summary judgment bear the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." Silverstein v. Federal Bureau of Prisons, 559 F. App'x 739, 752 (10th Cir. 2014); see also Adler v. Wal–Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

7

Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment.  Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Defendant State Farm moves for partial summary judgment on the following grounds:

*a.     Bad Faith*

Defendant argues that plaintiffs' bad faith claim fails as a matter of law.  Dkt. # 22, at 18. Specifically, defendant argues that there is a legitimate dispute as to the amount owed to plaintiffs under the policy, and plaintiffs "cannot establish [that] State Farm's conduct meets the elements required to prevail on a claim of bad faith."  Id. at 18-20.  Plaintiffs respond that State Farm acted in bad faith because it 1) underestimated the total replacement cost value of plaintiffs' metal turrets; 2) focused primarily on hail damage, rather than wind damage; 3) "failed to consider evidence of [p]laintiffs' prior roof repairs[,]" which would substantiate plaintiffs' claim that spot-repairs of plaintiffs' roof is "infeasible"; 4) "ignored damage covered by plaintiffs' policy"; and 5) improperly applied "a heightened standard of 'damage' inconsistent with [p]laintiffs' policy[.]" Dkt. # 32, at 23-27.

The Oklahoma Supreme Court has held that "an insurer has an implied duty to deal fairly and act in good faith with its insured and that the violation of this duty gives rise to an action in tort for which consequential and, in a proper case, punitive, damages may be sought."  Christian v. Am. Home. Assurance Co., 577 P.2d 899, 904 (Okla. 1977).  "The core of a bad-faith claim 'is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy.'" Flores v. Monumental Life Ins. Co., 620 F.3d 1248, 1255 (10th Cir. 2010) (quoting McCorkle v. Great Atl. Ins. Co., 637 P.2d 583, 587 (Okla. 1981)).  To succeed on a bad faith claim,

8

plaintiffs "must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for withholding payment of [plaintiffs'] claim." Oulds v. Principal Mut. Life Ins. Co., 6 F.3d 1431, 1436 (10th Cir. 1993); accord Shotts v. GEICO Gen. Ins. Co., 943 F.3d 1304, 1314 (10th Cir. 2019).   According to the Tenth Circuit, courts generally use a two-step analysis to determine whether a plaintiff has made a sufficient showing of bad faith. Shotts, 943 F.3d at 1314-15.   The Court considers 1) "whether there is a legitimate dispute between the insurer and the insured regarding coverage or the value of the claim"; and 2) "if the court determines there is a legitimate dispute between the parties, . . . whether the plaintiff offered specific additional evidence to demonstrate bad faith." Id. at 1315.   "The additional evidence required for this showing" may include evidence that 1) "the insurer did not *actually* rely on th[e] legitimate [dispute] to deny coverage"; 2) the insurer "denied the claim for an illegitimate reason"; 3) the insurer "otherwise failed to treat the insured fairly"; and 4) "the insured performed an inadequate investigation of the claim." Id. (internal quotations and citations omitted) (emphasis and alterations in Shotts, 943 F.3d at 1315).

For step one, the Court finds that there exists a legitimate dispute between plaintiffs and defendant regarding coverage and the total value of the claim.   Namely, plaintiffs' own roofing contractor confirmed that, when he inspected plaintiffs' roof, he observed that the roof was very brittle and crumbling, had dry rot, and "burnout" holes caused by sun exposure.   Mr. Avila testified that this deterioration was due to age and excess heat.   However, Mr. Avila did observe some missing shingles and did not rule out some hail damage.   Additionally, State Farm sent out multiple adjusters and an engineering expert to inspect plaintiffs' roof for covered storm-related damage. Those inspections consistently concluded that there was no wind and hail damage beyond what was

covered in CS Ecklehoff's estimated replacement cost value.  Consequently, plaintiffs engaged a public adjuster firm, Coppermark, and Coppermark submitted a proof of loss statement that asserted plaintiffs' roof required complete replacement for a total cost of $316, 518.63.  It was in response to the discrepancy between CS Ecklehoff and Coppermark's assessments that prompted State Farm to send additional adjusters and an engineering expert to re-inspect plaintiffs' roof.  Thus, there is a legitimate dispute as to whether the roof's damaged condition is due to wear and tear only--the repair or replacement of which is not covered under the policy--or whether covered storm-related damage entitles plaintiffs' to the full replacement cost value per the terms of the policy.

For step two, the Court finds that plaintiffs have failed to offer sufficient evidence of defendant's bad faith.  Plaintiffs present no facts from which a reasonable jury could find that State Farm did not actually rely on the legitimate dispute to deny the claim; denied the claim for an illegitimate reason; treated plaintiffs unfairly; or performed an inadequate investigation.  On the contrary, the undisputed facts establish that State Farm sent three adjusters, a team manager, and an engineering expert to inspect plaintiffs' roof in evaluating its claim determination.  The undisputed facts also establish that, despite any alleged hail or wind damage, plaintiffs roof was deteriorated due to age and excess heat.  Taken together, these facts demonstrate that State Farm investigated the damage, consulted with a third-party expert to confirm its own findings, and the dispute over the extent of covered damage and the amount owed under the policy is legitimate, given the factual questions as to the role of wear and tear in the roof damage.  The Court notes that plaintiffs point to evidence such as the amount of coverage State Farm estimated for their metal turrets, or the damage standard applied by State Farm's engineering expert (i.e., whether accidental direct physical loss is a lesser standard than impaired water-shedding ability or reduced expected life span of the wood

10

shake roof); however, such disputes are legitimate questions of fact as to what the policy terms cover with respect to plaintiffs' breach of contract claim.  On the other hand, plaintiffs present no direct evidence of defendant's intentional bad-faith conduct.

That plaintiffs' roof was in such a deteriorated condition because of dry rot, burnouts, erosion, and so forth is sufficient to substantiate that there is a legitimate dispute as to the extent of covered versus non-covered damage and the amount owed under the policy.  Therefore, the Court grants defendant's motion for partial summary judgment as to plaintiffs' bad faith claim (count 2).

b.    *Punitive Damages*

Under Oklahoma statute, a jury may award punitive damages "[w]here the jury finds by clear and convincing evidence that . . . [a]n insurer has recklessly disregarded its duty to deal fairly and act in good faith with its insured[.]"  OKLA. STAT. tit. 23, § 9.1(B)(2).  Thus, a punitive damages claim is "dependent upon bad faith for its basis." Peters v. Am. Income Life Ins. Co., 77 P.3d 1090, 1099 n.9 (Okla. Civ. App. 2002).  Accordingly, plaintiffs' claim for relief based on punitive damages fails as a matter of law, and the Court grants defendant's motion for partial summary judgment as to the issue of punitive damages.

**IV.**

Defendant and plaintiffs move in limine to exclude certain evidence and argument at trial:

a.    *Defendant's Motion to Exclude Plaintiffs' Expert Carl E. Martin (Dkt. # 25)*

Defendant requests that the Court exclude the testimony of plaintiffs' expert, Carl E. Martin, "because his testimony is unreliable and more prejudicial than probative."  Dkt. # 25, at 6. Specifically, defendant argues that 1) Mr. Martin "intentionally used incorrect terminology [in his expert report] to describe the wood product covering [p]laintiffs' roof . . . [because he] claims he was

11

engaging in a 'litmus test' to determine whether State Farm and its counsel were 'confident' in their own claims"; 2) Mr. Martin, despite inspecting plaintiffs' property more than 15 months after the date of loss, "made no efforts to review the numerous photos taken by State Farm's adjuster during his inspection, roughly four months after the storm"; and 3) Mr. Martin "admits that some of the information he relies on in his report is pure speculation." Id. at 8-9.  Plaintiffs respond that Mr. Martin's conclusions "go to his credibility, not the reliability of his testimony[,]" and that Mr. Martin "employed reliable scientific methodology in forming his opinions[,]" including "rel[ying] on a significant volume of data and information[.]" Dkt. # 38, at 5-10.

       1.     Relevant Factual Background

After filing suit, plaintiffs retained Mr. Martin "as an expert witness to provide opinions regarding causation of damage to [p]laintiffs' insured property." Id. at 3.  According to his curriculum vitae (CV), Mr. Martin has 42 years of experience "providing engineering services, including 34 years in forensic engineering services[.]" Dkt. # 38-1, at 1.  Mr. Martin has a bachelor's and a master's degree in engineering, and is a registered engineer in the state of Oklahoma.  Id.

On August 19, 2020, Mr. Martin performed an on-site inspection of plaintiffs' roof, in order to "render his expert opinion regarding its condition and whether any storm-caused damage existed to the property." Dkt. # 38, at 3.  Consequently, Mr. Martin prepared a Rule 26 report, dated August 19, 2021, wherein he provided his findings and statement of opinions as to whether plaintiffs' "wood shingles experienced damage as a result of wind and hail exposure from the storm that occurred on May 25th, 2019[.]" Dkt. # 25-3, at 3.  Mr. Martin stated that the "basis of [his] evaluation included": 1) August 19, 2020 "site examination with shingle sample collection"; 2) "review of [Stanton Smith's] EFI Global roofing assessment report dated May 7th, 2020 and weather data"; 3) "review

12

of site-specific wind verification report by Corelogic"; and 4) "review of [meteorologist] Dr. Kevin

Kloesel report dated July 22, 2021[.]"  Id.

Mr. Martin estimated that the residence was more than 25 years old.  Id.  Mr. Martin

concluded that "many shingles [on plaintiffs' roof] experienced various magnitudes of displacement.

Shingles indicating displacement could have only experienced the displacements found to exist by

wind forces."  Id. at 5.  Mr. Martin further concluded that based on the shingle conditions of

plaintiffs roof--brittle, deteriorated, displaced from wind--"even relatively low hailstone impact

energy exposures in the range reported to have occurred on May 26, 2019, would result in wood

fragment loss to the shingles.  Given these considerations, combined with weather data information

from this location, damages to shingles occurred as a result of wind and hail exposures that occurred

on May 26, 2019."  Id.  Additionally, Mr. Martin found that "on May 26, 2019, wind speeds of 73

mph were probable and would have been sufficient to result in wind-related displacement of shingles

. . . [and] that the maximum hail exposure that could have occurred was likely from 1-inch-diameter

hailstones."  Id.  Thus, Mr. Martin concluded that "the May 26, 2019 storm event resulted in shingle

displacements and shingle fragment loss that was caused by wind and hail exposure . . . [and] [d]ue

to conditions of the shingles, damages related to wind or hail cannot be readily repaired."  Id.  Mr.

Martin included as an appendix various photographs he took of plaintiffs' property, as well as a

Google Earth aerial view of the residence.  Id. at 8-36.

On December 13, 2021, defendant deposed Mr. Martin.  Dkt. # 38, at 3.  During his

deposition, Mr. Martin testified that he concluded that plaintiffs' wood shingle roof was there since

1995 because "there would be no reason to have replaced [the roof] between [1995 and 2019]." Dkt.

# 25-2, at 12.  Mr. Martin conceded that he did not know "with a hundred percent certainty," but that

should be the case, "[u]nless there was a catastrophic event that occurred between 1995 and 2010 when the homeowner purchased the property," which would be "the only reason" the roof would have been replaced in that time frame. Id. Mr. Martin further testified that he intentionally used the term "wood shingle," as opposed to (the more precise term) "wood shake," in his report discussing plaintiffs' roof, as a "an intellectual litmus test" of whether a person reviewing his report is "very insecure about their position [such that] they are grasping at things that don't matter." Id. at 21. Mr. Martin confirmed that he had not reviewed photos taken prior to the May 7, 2020 report from defendant's third-party engineering firm, EFI Global (Dkt. # 22-16), to determine what changes may have occurred to the roof from the May 25, 2019 date of loss until his own August 19, 2020 inspection. Id. at 24. That is, Mr. Martin confirmed that he never reviewed State Farm's photos, which were taken four months after the May 25, 2019 storm--the photos taken closest in time to the date of loss. Id. at 24-25. Mr. Martin testified that he did not think it was necessary to review an adjuster's photos, because he "may not find [them] to be helpful[,]" and "prefer[s] to look at an engineer's [photos]." Id. at 25. According to Mr. Martin, "the conditions of the roof should stand on what it is." Finally, Mr. Martin testified that he saw "a video from the roofer[,]" but he does not know when he saw the video, id. at 38, and makes no mention in his Rule 26 report of relying on the video.

2.      Legal Standard

Fed. R. Evid. 702, which governs the admissibility of expert witness testimony, provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts and data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Further, the Supreme Court has found that, pursuant to Rule 702, the Court performs a "gatekeeping role . . . of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.  Pertinent evidence based on scientifically valid principles will satisfy those demands." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993).  The objective of this "gatekeeping requirement . . . is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practices of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).

Additionally, Fed. R. Evid. 403 states, in pertinent part, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues [or] misleading the jury[.]"

3.      Discussion

The Court finds several deficiencies in Mr. Martin's expert report and proposed testimony. First, Mr. Martin does not base his opinions on sufficient facts and data.  Specifically, Mr. Martin intentionally disregarded the State Farm adjusters' photos, which were taken closest in time to the alleged date of loss.  Instead, the only photos that Mr. Martin reviewed (other than his own) were

EFI Global's, which were taken nearly a year after the alleged date of loss.[6]  Thus, Mr. Martin did not compare the roof photos taken closest in time to the date of loss to the areas he concluded (from his August 2020 inspection) had sustained wind and hail damage as a result of the May 25, 2019 storm.  Further, Mr. Martin concluded, apparently relying on Google Earth satellite imagery only, that plaintiffs' roof had not been replaced since 1995, unless there was some sort of catastrophic event.   Mr. Martin's assumption is belied by defendant's retained engineering expert's report, prepared by Mr. Thompson of Engineering, Inc., which states that Mr. Wilson informed the defense expert that "the roof coverings on the main residence and detached pool house were installed in approximately 2008."  Dkt. # 22-18, at 4.  Finally, Mr. Martin definitively concluded that based on the condition of plaintiffs' roof, combined with weather data as to the wind speed and hail size experienced during the May 25, 2019 storm, plaintiffs' roof was damaged as a result of this specific storm.  However, Mr. Martin's report is silent on whether he actually observed any wood shakes with hail impact marks or splitting that demonstrated hail damage, as opposed to age-related deterioration. Mr. Martin's critically flawed analysis is analogous to a meteorologist concluding that a tornado must have touched down onto the ground, merely because all of the conditions necessary for a tornado to form were present.  However, something more would be required for such a conclusion, such as eyewitness accounts of a tornado on the ground, or reports of damage associated with a

---

[6]     The Court notes that Mr. Martin testified that he watched "a video from the roofer"; however, Mr. Martin did not remember when he saw the video, and he makes no mention of the video in his report or whether he relied on it in reaching his conclusions.  Pursuant to Rule 26, an expert report must contain "a complete statement of all opinions the expert will express and the basis and reasons for them."  The Court will not speculate as to whether Mr. Martin may have relied on the video without stating so; therefore, the Court will consider only those bases for his opinions that Mr. Martin stated with specificity in his report.

tornado touching down.  In sum, Mr. Martin did not seek out, and failed to rely on, sufficient facts and data in reaching his conclusions.

Second, and closely linked to Mr. Martin's failure to rely on sufficient facts and data, Mr. Martin failed to reliably apply reliable principles and methods in his analysis.  The Supreme Court has found that a district court has no obligation "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  Here, for example, despite 1) inspecting plaintiffs' roof over a year after the alleged date of loss, and 2) failing to compare the State Farm adjuster's photos to the areas he identified as displaced by wind damage, Mr. Martin concluded that plaintiffs' roof damage occurred as a result of the May 25, 2019 storm.  If he had compared his findings to the State Farm photos, he could have determined whether the damage he identified was present on the roof at the time that State Farm's adjuster took the photos just four months after the storm.  Such a comparison could have substantiated that the identified damage was present four months after the May 25, 2019 storm, or ruled out the possibility that there were intervening storms in the eleven months between State Farm's inspection and Mr. Martin's inspection that could have caused said damage.  Moreover, Mr. Martin concluded that plaintiffs' roof shingles were "displaced" because of wind damage, which he states--without substantiation--is the only possible explanation for the displacement; however, Mr. Martin does not consider and rule out alternative explanations for "displaced" shingles, such as

cupping and curling due to age-related weathering.[7]  By contrast, plaintiffs' roofing contractor (Dkt. # 42-3, at 4) and defendant's engineering (Dkt. # 22-18, at 18) and general contractor experts (Dkt. # 27-4, at 18) observed cupping and curling on plaintiffs' roof; therefore, an adequate causation analysis would include a discussion of cupping and curling as a potential explanation for "displaced" shingles.   Consequently, Mr. Martin's analysis is replete with analytical gaps, and rests predominantly on his own ipse dixit.

Finally, Mr. Martin's intentional use of incorrect or imprecise language in his report, as an "intellectual litmus test," raises issues of 1) the reliability of his report and testimony, and 2) the substantial risk that his report and testimony would confuse the issues or mislead the jury.  Rule 702 requires that an expert's testimony help the jury understand the evidence.  Fed. R. Evid. 702(a).  Mr. Martin's intentionally imprecise language does not help the jury understand the evidence.  For example, he asserts that the distinction between a wood shingle and a wood shake "[does not] matter"; however, according to the Cedar Shake & Shingle Bureau, a cedar shingle can resist wind speeds of up to 173 mph, while cedar shakes can resist wind speeds of up to 245 mph, Dkt. # 25-5, at 10.  In other words, there is a significant difference between a wood shingle and a wood shake when it comes to assessing wind-related causation issues, which is directly relevant to plaintiffs' breach of contract claim as to the cause and extent of alleged storm-related damage to their wood shake roof.  For that same reason, the Court finds that Mr. Martin's intentionally ambiguous language creates a substantial risk of confusing or misleading the jury, which outweighs the

---

[7]  "Cupping is caused by uneven moisture absorption and drying . . . .  Curling is caused by natural stresses in the wood that are released when the shake . . .is cut and [is] made worse by moisture cycling."  Kenton Shepard and Nick Gromicko, Mastering Roof Inspections: Wood Shakes and Shingles, Part 5, INT'L ASS'N OF CERTIFIED HOME INSPECTORS, https://www.nachi.org/wood-shakes-shingles-part5-137.htm.

probative value, if any, of his report and proposed testimony that the Court determined was unreliable under Rule 702 as well. See Fed. R. Evid. 403, 702.

In sum, the Court finds that defendant's motion to exclude Carl E. Martin (Dkt. # 25) should be granted because Mr. Martin's report and proposed testimony is not based on sufficient facts and data, does not reliably apply reliable principles and methods, and its probative value, if any, is substantially outweighed by the risk of confusing or misleading the jury.

       b.      *Plaintiffs' Motion to Exclude Defense Expert Jon Derek VanDorn (Dkt. # 27)*

Plaintiffs request that the Court exclude defense expert Jon Derek VanDorn's testimony at trial. Dkt. # 27, at 1. Specifically, plaintiffs argue that, pursuant to Rule 702 and 403, the Court should exclude Mr. VanDorn's testimony because 1) it is not based on personal knowledge; 2) relies on inadmissible hearsay; 3) impermissibly attacks other experts' credibility; and 4) is cumulative in light of the proposed testimony of defendant's other retained expert, Mr. Thompson of Engineering, Inc. Id. at 3-12. Defendant responds that Mr. VanDorn's testimony complies with Rules 702 and 403, because 1) personal knowledge is not required for expert testimony; 2) expert opinions may be based on otherwise inadmissible evidence; 3) "experts regularly challenge the opinions of other experts"; and 4) "Mr. VanDorn is the only general contractor listed as a witness for State Farm and will opine on damages . . . . State Farm's other trial expert is an engineer who has not focused on the dollar amount of damages or the cost to repair damages allegedly caused by the storm"; therefore, Mr. VanDorn's testimony is "neither duplicative nor cumulative." Dkt. # 35, at 5, 24.

       1.      Relevant Factual Background

After the alleged date of loss, "State Farm made four separate inspections of [p]laintiffs' property, including an inspection by a third-party engineer. State Farm's [retained] expert engineer

in this lawsuit, Shawn Thompson, separately made a site visit, took numerous photos, and submitted an expert report." Id.  Over the course of litigation, plaintiffs retained two expert witnesses: "Carl Martin, an engineer who inspected the property on August 19, 2020, and Patrick Carrell, a licensed adjuster . . . who inspected the property on August 11, 2021." Dkt. # 27, at 3.  State Farm's retained general contractor expert, Mr. VanDorn, "did not perform an in-person inspection of the [p]roperty," Dkt. # 35, at 7, but his expert report states that he reviewed 1) Mr. Carrell's (adjuster) expert report; 2) Mr. Martin's (engineer) expert report; 3) Mr. Smith's (engineer) report; 4) Dr. Kevin Kloesel's (meteorologist) expert report; 5) State Farm's claim file; 6) Mr. Thompson's (engineer) expert report; John Lavin's (meteorologist) expert report; and 7) plaintiff's petition.  Dkt. # 35-2, at 3.

According to Mr. VanDorn's Rule 26 report, his opinions are "based upon [his] review of the documentation provided to [him] . . . [his] twenty-three (23) years of experience as an evaluator and estimator of property damage as well as [his] formal education, training, and knowledge[.]" Id. at 2.  Additionally, Mr. VanDorn has "performed numerous restoration projects" as a general contractor, including wood shake roofs, and uses Xactimate, "a computerized estimating program," which is "considered to be an industry standard and is utilized by most restoration contractors and the majority of insurance carriers in the United States[,]" to calculate "the estimated cost of property damage restoration." Id. at 3.

Mr. VanDorn makes two overarching conclusions in his report.  First, he finds that "State Farm appears to have made the correct conclusions when determining the extent of the storm related damage and whether the damage was repairable." Id. at 18.  Specifically, he bases this opinion on 1) State Farm conducting two inspections by its adjusters as well as an inspection by a third-party engineer; 2) "State Farm's adjusters using Xactimate to estimate the damages"; 3) utilizing an Eagle

View report, which is industry standard, to determine "the needed roof dimensions and quantities"; 4) including the cost of guttering, down spout, leaf guards, and window screens "despite not having the opportunity to inspect the components for damage"; 5) including the cost of four separate trip charges to comb the air conditioner condenser fins, which "overstates the true cost to comb the fins, as only one trip would be required to comb all four units"; 6) comparing photographs from various inspections to determine that "[t]emporary repairs of wind damage which were later documented by Thompson and Carrell appear to not have been present when State Farm made their roof inspection suggesting [that] these damages occurred after the date of loss"; 7) finding that State Farm correctly determined the extent of damage; and 8) said damage was repairable because plaintiffs reported successfully repairing one slope of the roof two years prior to submitting their claims, and based on the age of the roof compared to the expected life span of wood shakes. Id. at 15-18.

Second, Mr. VanDorn opines that plaintiffs' retained adjuster expert, Mr. Carrell, submitted a report and estimate that "significantly overstates the extent of storm related damage[s] and inflates the true cost to complete the repairs of the documented damages." Id. at 18. Specifically, Mr. VanDorn faults Mr. Carrell for 1) "fail[ing] to demonstrate any discernible hail or wind damage with three exceptions" (two of those exceptions were those temporarily repaired areas that were not present in State Farm's adjusters' photos); 2) concluding that "uplifted shingles" were "indicative of high winds[,]" but Mr. Carrell "does not document exactly which shingles he believes are uplifted, but his photos show widespread curled and cupped shakes"; 3) stating that "the shingles are extremely brittle and not in repairable condition"; 4) including line items in his estimate that "would be redundant and unnecessary" based on materials included in the line items, building codes, and Tulsa's relevant climate zone; 5) including significant upgrades, as opposed to replacement value

of the existing roof components; 6) replacing certain components that were not reported damaged by the storm; 7) alleging damage to copper chimney shroud, when his photos indicate he inspected the chimney shroud from the ground; and 8) including general contractor overhead and profit in the estimate, which may not be a necessary cost depending on whether plaintiffs deal with various vendors directly.  Id. at 18-23.

Defendant's other retained expert, engineer Mr. Thompson of Engineering, Inc., inspected plaintiffs' roof on July 22, 2021, and submitted his Rule 26 report on October 11, 2021.  Dkt. # 22-18, at 3.  Mr. Thompson's report included 73 photos from his inspection.  Id. at 4-32.  Based on his visual inspection, research, and professional experience, Mr. Thompson concluded that 1) storm damage to plaintiffs' property consisted of a "limited number of reparable wood roof shakes and shingles displaced by high winds [and] [h]ail damage to an older deteriorated plastic tennis court bench"; 2) "small hail related dents that were cosmetic but not functionally damaging to the following": copper roof metal valleys, copper spire, lightweight rooftop metals, and lightweight metal dryer vent cover; 3) splits and curling on a "a number of wood shakes and shingles on this roof are not the result of storm damage but are due to natural aging of wood exposed to repeated cycles of weather and moisture"; and 4) "[w]ater intrusion into the home is the result of deferred maintenance issues . . . [not] storm damage."  Id. at 39.

2. Legal Standard

Fed. R. Evid. 702, which governs the admissibility of expert witness testimony, provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts and data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Further, pursuant to Fed. R. Evid. 703, an expert "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." (Emphasis added). Further, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Civ. P. 703 (emphasis added). Finally, Rule 403 states, in pertinent part, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence."

3.    Discussion

As a preliminary matter, the rules governing expert testimony make clear that an expert is not required to have personal knowledge in order to form opinions and testify. The rules also make clear that an expert may rely on inadmissible evidence, such as hearsay, in forming his or her opinions and testifying to those opinions at trial.

The Court finds that Mr. VanDorn's report and proposed testimony should be admitted in part and excluded in part. Specifically, a portion of Mr. VanDorn's testimony as a general contractor is helpful for the jury to determine whether State Farm's repair estimate is reasonable. Further, his testimony constitutes rebuttal evidence as to plaintiffs' retained adjuster expert, Mr. Carrell. However, there are portions of Mr. VanDorn's testimony that are impermissibly speculative or run the risk of being needlessly cumulative.

First, Mr. VanDorn's knowledge and expertise can help the jury determine whether State Farm relied on industry standard methods of calculating the estimated repair cost for plaintiffs' roof. For example, Mr. VanDorn opines that State Farm's use of Xactimate and Eagle View technology is industry standard in calculating repair estimates.  Moreover, Mr. VanDorn can opine, based on his expertise, whether State Farm's repair cost estimate corresponds to the damage State Farm identified, and how much said repairs should cost generally in the current market.

Further, Mr. VanDorn reviewed data, including photos from various inspections over time, invoices, and six expert reports, and analyzed State Farm's and Mr. Carrell's repair estimates based on his expertise as a general contractor and the facts and data he had been provided.  Mr. VanDorn did not need to personally inspect the property to criticize Mr. Carrell's roof replacement estimate, which Mr. VanDorn notes was inaccurate, with line items that were redundant, unnecessary, or a significant upgrade from plaintiffs' pre-loss condition.  Dkt. # 35-2, at 18-19.  Mr. VanDorn concludes that Mr. Carrell's estimate was inaccurate or inflated based on examining the line items in Mr. Carrell's estimate and comparing it to invoices for already completed repairs, as well as applying his knowledge of building code requirements and Tulsa's climate zone.  Such conclusions are permissible rebuttal evidence; that is, Mr. VanDorn can point to specific line items in Mr. Carrell's estimate, including unnecessary materials or significant upgrades from pre-loss condition, which go to rebutting Mr. Carrell's conclusions, not his credibility.  In sum, such conclusions can be reliably reached through Mr. VanDorn's analysis of existing facts and data without a personal inspection.

Notwithstanding, there are portions of Mr. VanDorn's opinions that are impermissibly speculative or cumulative.  For example, Mr. VanDorn concludes that State Farm's estimate

24

reasonably addresses the storm-related damage, which requires making a finding as to the extent of storm-related damage to plaintiffs' roof and whether it is reparable. Mr. VanDorn testifying to such a finding is both speculative and cumulative. First, Mr. VanDorn has not actually inspected plaintiffs' roof--he has not chalked various components to see if there are hail dents, he has not touched the wood shakes to feel if they have hail impact marks or if they are too brittle to be repaired, and so forth. Mr. VanDorn concludes that plaintiffs' roof is reparable based on the roof's age and a previous successful roof repair. Dkt. # 35-2, at 21. Mr. VanDorn essentially challenges plaintiffs' contention that the roof is too brittle to be repaired without actually having touched its wood shakes. On the other hand, plaintiffs' roofing contractor recorded a video (that preceded plaintiffs' insurance claim and the ensuing litigation) in which he stated that the wood shakes were very brittle and crumbling when he touched them. There is an analytical gap between Mr. VanDorn's conclusion based on the expected useful life of a wood shake, versus the actual condition of plaintiffs' wood shake roof. Consequently, Mr. VanDorn can testify to the anticipated life span of a wood shake roof generally; however, that knowledge, standing alone, is insufficient to reliably conclude that plaintiffs' roof must be reparable. Moreover, just because a repair of one slope of plaintiffs' roof was successful two years prior, does not mean that such a limited repair is possible now. There are other variables, not least of all Oklahoma's often extreme weather conditions, which may affect the actual useful life or potential for repair of a wood shake roof when compared to what is advertised in a brochure.

Second, Mr. VanDorn's opinion as to the extent of storm-caused damage would be cumulative. Defendant has another retained expert, Engineering, Inc.'s Mr. Thompson, who is an engineer and who has inspected plaintiffs' roof and can testify to his first-hand observations as to

the extent of storm-related damage and whether or not the roof is reparable.  See Dkt. # 22-18, at 39.

Mr. VanDorn's testimony as to the extent of storm-related damage and whether it is reparable would

merely re-state Mr. Thompson's conclusions.  On the other hand, Mr. VanDorn's testimony that

pertains to the financial aspects of any damage repairs, including: whether State Farm's estimate was

reasonable based on the damage its adjusters observed; and whether plaintiffs' retained adjuster

expert calculated a reasonable repair estimate based on the facts and data Mr. VanDorn was

provided, are sufficiently distinct from Mr. Thompson's proposed testimony.  In other words, Mr.

Thompson's testimony is most relevant for assisting the fact finder in determining whether there was

damage to plaintiffs' roof within the meaning of their policy.  Mr. VanDorn's testimony is most

pertinent to whether State Farm underpaid for plaintiffs' covered damage, assessing the amount of

contractual damages, and so forth.  Thus, the Court finds that those parts of defendant's retained

experts' proposed testimony are distinct and not cumulative.

In sum, the Court finds that plaintiffs' motion in limine as to Mr. VanDorn's testimony

should be denied in part as to excluding Mr. Van Dorn's testimony; and granted in part as to limiting

his testimony in that 1) he may not opine on the extent of storm-caused damage and whether the

storm-caused damage is reparable; and 2) his testimony must be sufficiently distinct from Mr.

Thompson, which means he may testify to the financial aspects and reasonableness of State Farm's

and Mr. Carrell's estimates based on the damage identified in their respective estimates.

     *c.*     *Defendant's Motion to Exclude or Limit Plaintiffs' Non-Retained Experts (Dkt. # 24)*

State Farm requests, pursuant to Fed. R. Civ. P. 26 and 37, that the Court limit the testimony

of plaintiffs' "non-retained experts," Greg Cannon (Coppermark) and Samuel Avila (A-Best

Roofing).  Dkt. # 24, at 6.  Specifically, defendant argues that plaintiffs "have provided no expert

report for Mr. Cannon or Mr. Avila . . . [and] [p]laintiffs' minimal disclosures are insufficient to constitute a summary of the facts and opinions of the non-retained expert that is required[.]" Id. Defendant further argues that "any reference to the individuals as an expert is prejudicial due to conclusions a jury might draw from that label and . . . not probative of the issues[.]" Id. at 10. Finally, defendant argues that "Mr. Cannon lacks relevant personal knowledge and should be precluded from testifying at trial"; and "Mr. Avila's testimony should be limited to his first-hand information and knowledge as a lay witness[.]" Id. at 15-17. Plaintiffs respond that they were not required to provide expert reports for non-retained experts Mr. Cannon and Mr. Avila. Dkt. # 39, at 3. Plaintiffs did not employ Mr. Avila or Mr. Cannon "for the [specific] purpose of providing expert testimony"; however, both Mr. Cannon and Mr. Avila "possess knowledge and skills beyond those held by lay people . . . and because they were instrumental in the underlying insurance claim, [p]laintiffs have designated [them] as non-retained expert witnesses." Id. at 4. Plaintiffs further respond that their disclosures for Mr. Cannon and Mr. Avila meet the standards for non-retained experts set forth in Rule 26(a)(2)(C). Id. at 5.

1.    Relevant Factual Background

After the alleged date of loss, but before submitting a claim to State Farm, plaintiffs asked contractor A-Best Roofing "to inspect the [wood shake] roofs of their home and pool house and advise [p]laintiffs of the condition of those roofs." Dkt. # 32, at 16. A-Best Roofing employee, Mr. Avila, inspected plaintiffs' roof after the May 25, 2019 storm, and "maintains personal knowledge regarding [p]laintiffs' roofs[.]" Dkt. # 39, at 3.

On October 7, 2019, State Farm's claims specialist issued plaintiffs a payment "based on a replacement cost value of damage to [p]laintiffs' property ($25,948.87), minus [p]laintiffs'

deductible ($9,635.00) and depreciation costs ($3,116.49), for an actual cash value of $13,197.38."

Dkt. # 22, at 12.  Plaintiffs, believing that State Farm's payment on the claim was insufficient,

"entered into a contract with . . . Coppermark to 'assist [them] in the preparation, presentation and

settlement' of their insurance claim."  Id. at 13 (quoting Coppermark contract, Dkt. # 22-9).  Mr.

Cannon, Coppermark's founder, majority shareholder, and a public adjuster for the firm, "inspected

[p]laintiffs' property, took photographs of [p]laintiffs' property, and participated in the insurance

claim process on [p]laintiffs' behalf."  Dkt. # 39, at 3.

On August 19, 2021, plaintiffs served defendant with a copy of their expert disclosures (Dkt.

# 24-1), listing Mr. Cannon and Mr. Avila as "non-retained experts[.]"  Dkt. # 24-1, at 5-6.  Mr.

Cannon's disclosure states:

> It is anticipated [that] Mr. Cannon will offer testimony relating to the scope of storm-caused damage to [p]laintiffs' insured property; the cost to restore the subject property to its pre-loss condition; claims handling; coverage afforded by the at-issue insurance policy; inspection of the [p]laintiffs' insured property; and his research into the storm that is the subject of this litigation.

Id. at 5.  Mr. Avila's disclosure states:

> It is anticipated [that] Mr. Avila will offer testimony relating to the extent of storm-caused damage present on [p]laintiffs' insured property; repairability of [p]laintiffs' roof; actions and work necessary to restore [p]laintiffs' insured property to its pre-loss condition; temporary repairs made to [p]laintiffs' insured property as a result of the subject storm; wood shake roofing systems; and the cost to restore [p]laintiffs' insured property to its pre-loss condition.

Id. at 5-6.

2.    Legal Standard

Rule 26 requires a party to disclose the identity of any witness who may be called to provide

expert testimony at trial.  In addition to disclosing the identity of such witnesses, if a witness has

been "retained or specially employed" to give expert testimony he must submit a report containing a complete statement of his opinions, the basis for his opinions, a list of any exhibits used to support his opinion, and his qualifications to testify as an expert.  Fed. R. Civ. P. 26(a)(2)(B).  A party's failure to disclose the identity of an expert witness or submit an expert report requires the Court to automatically exclude expert testimony unless the violation of Rule 26(a)(2) was justified or was harmless under the circumstances.  Fed. R. Civ. P. 37(c)(1); see also Woodworker's Supply, Inc., v. Principal Mutual Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999).  Notwithstanding, the expert report requirement does not apply if an expert is considered a "non-retained" expert, and he may testify without submitting an expert report.  See 1993 Advisory Committee Notes to Fed. R. Civ. P. 26.

Rule 26(a)(2)(C) requires that, for expert witnesses who do not provide a written report (i.e. non-retained experts), plaintiffs must include in their disclosure to defendant 1) the "subject matter" of the witness's expert opinion testimony; and 2) a "summary of the facts and opinions to which the witness is expected to testify."  However, the applicability of Rule 26(a)(2)(C)'s requirements turns on whether Mr. Cannon and Mr. Avila are lay witnesses within the meaning of Fed. R. Evid. 701, or expert witnesses within the meaning of Fed. R. Evid. 702.  Under Rule 701, "testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception"; "(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue"; and "(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Rule 702 states that a "witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or

29

determine a fact in issue"; "(b) the testimony is based on sufficient facts or data"; "(c) the testimony is the product of reliable principles and methods"; and "(d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; see also Daubert, 509 U.S. at 589-95.

Notably, that these witnesses have "particularized knowledge" does not automatically place their testimony within the purview of Rule 702 (and thus subject to Rule 26(a)(2)(C) disclosure requirements).  See Fed. R. Evid. 701 advisory committee's note to 2000 amendments ("For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. . . . Such opinion testimony is admitted not because of experience, training, or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business").  Rule 702 creates standards that permit experts with no personal knowledge of any relevant facts of a case to form opinions and testify to those opinions at trial.

3.    Discussion

Here, plaintiffs appear to believe that because Mr. Cannon and Mr. Avila possess particularized knowledge in the fields of insurance adjusting and roofing, respectively, they must be designated as non-retained experts.  See Dkt. # 39, at 4.  The Court disagrees.  Mr. Cannon and Mr. Avila's proposed testimony is relevant and helpful to the jury because of their personal knowledge related to the at-issue insurance claim only.  Under Rule 701, Mr. Cannon and Mr. Avila may testify--as lay witnesses--to their personal knowledge and opinions that were rationally formed based on their perception.  Mr. Cannon and Mr. Avila's perceptions will inevitably be influenced by their

particularized knowledge in insurance adjusting and roofing, respectively.  Accordingly, Mr. Cannon and Mr. Avila may testify as fact witnesses.

For example, Mr. Avila may testify to his perception of the condition of plaintiffs' roof when he examined it and whether, based on his professional experience, he believed it required replacement.  Crucially, Mr. Avila may not testify to issues or facts of which he has no personal knowledge, which is one of the key distinctions between an expert (who must comply with Rule 26 disclosures) and a lay witness.  As an additional example, Mr. Avila may testify to temporary repairs he completed at the subject residence; however, he may not testify that the temporary repairs he made were to address damage that was caused by the May 25, 2019 storm, specifically.  Mr. Avila has no personal knowledge as to the cause of the damage and such causation testimony crosses over into expert testimony within the meaning of Rule 702 and must be scrutinized under Daubert.

Similarly, Mr. Cannon may testify to his personal knowledge and perceptions with respect to inspecting plaintiffs' property, representing plaintiffs during the pre-litigation claims process, and so forth.  Like Mr. Avila, Mr. Cannon may not testify to issues or facts of which he has no personal knowledge.  Namely, Mr. Cannon could testify (if he has first-hand knowledge) that, after reviewing plaintiffs' policy and inspecting their property, he advised plaintiffs that, based on his experience as an insurance adjuster, he believed that plaintiffs' damage should be covered under the at-issue policy.  In this example, Mr. Cannon would be testifying to relevant facts that provide background context regarding how the dispute between plaintiffs and defendant developed.  By contrast, Mr. Cannon may not testify definitively that, based on the language and construction of the subject policy, plaintiffs' damage is covered.

The Court notes defendant's argument that Mr. Cannon lacks sufficient personal knowledge to testify; however, it is undisputed that Mr. Cannon personally inspected the property, was present during defendant's third-party engineer's inspection, as well as being involved in the claims handling process and communicating with plaintiffs over the course of Coppermark's representation. Dkt. # 24-3, at 2-40 (Mr. Cannon deposition); Dkt. # 39-5, at 1-4 (email exchange between Mr. Wilson and Mr. Cannon). That Mr. Cannon does not have personal knowledge of very many things relevant to this case, or allegedly had an "incorrect recollection of the facts" during his deposition, Dkt. # 24, at 16, goes to the weight, not admissibility, of his testimony--it is for the jury to evaluate the significance of Mr. Cannon's testimony. See United States v. Foust, 989 F.3d 842, 847 (10th Cir. 2021). Therefore, to the extent that Mr. Avila's and Mr. Cannon's testimony is 1) relevant; 2) helpful to the jury; 3) based on their own perceptions, which may be influenced by their particularized knowledge; and 4) not otherwise excluded under the Federal Rules of Evidence, it is admissible.

Finally, because Mr. Cannon and Mr. Avila's testimony is admissible pursuant to Rule 701-- which is limited to non-expert testimony of lay witnesses based on their perceptions--the Court finds that referring to Mr. Cannon and Mr. Avila as "experts," when in fact they are non-expert fact witnesses, creates a substantial risk of unduly influencing, confusing, or misleading the jury, which is prohibited under Rule 403. See Fed. R. Evid. 403.

In sum, the Court finds that defendant's motion should be denied in part as to excluding Mr. Cannon's testimony; and granted in part as to limiting Mr. Cannon and Mr. Avila's testimony to lay witness testimony based on personal knowledge, which includes particularized knowledge due to their respective professional experience. The Court further finds that defendant's motion should be

granted in part as to precluding plaintiffs from referring to Mr. Cannon and Mr. Avila as experts at trial.

      *d.*      *Defendant's Omnibus Motion in Limine (Dkt. # 26)*

Defendant moves in limine to exclude from evidence certain issues and to direct plaintiffs' counsel "to refrain from offering any evidence, posing any question, and making any statement or comment regarding such matters in the presence of the jury." Dkt. # 26, at 8. Specifically, defendant moves to exclude 16 items: 1) any reference to the May 25, 2019 wind and hail storm as a "tornado"; 2) any reference to Mr. Cannon or Mr. Avila as "experts"; 3) "any evidence of damages allegedly suffered by [p]laintiffs that have not previously been disclosed"; 4) "testimony regarding or referenc[ing] any of State Farm's advertising, mottos, or slogans"; 5) "mentio[n] [of] the Unfair Claims Settlement Practices Act"; 6) argument as to "State Farm ha[ving] a fiduciary duty"; 7) any reference to "punitive damages or a need to 'punish' State Farm"; 8) "golden rule arguments"; 9) "statements or references to any discovery, motions, or pretrial disputes"; 10) "any reference to any settlement discussions or proposals in this case, or to any offer of judgment made by any party"; 11) if Mr. Cannon is permitted to testify, "all statements made to him by [p]laintiffs or others" under the rule against hearsay; 12) "[n]on-expert statements that the house was damaged by a storm, or that the roof must be replaced because of the storm," or witness testimony as to hearsay statements from roofers or contractors "that the house was damaged by a storm or that the roof must be replaced because of the storm"; 13) "[a]ny statements or references that companies are generally 'bad'"; 14) "[s]tatements or references to the financial status of State Farm at 'first stage'"; 15) if State Farm's motion for partial summary judgment is granted, "any reference to bad faith or that State Farm acted

in bad faith"; and 16) any statements, specific or general, "that 'the burden of proof falls on the insurance company' or on State Farm." Id. at 8-22.

As a preliminary matter, plaintiffs do not object to defendant's motion in limine as to any statements, specific or general, "that 'the burden of proof falls on the insurance company' or on State Farm[,]" Id. at 8; therefore, the Court finds that defendant's motion in limine as to that item should be granted. Additionally, the Court found in Part IV.c, supra, that plaintiffs should be precluded from referring to Mr. Cannon and Mr. Avila as "experts"; accordingly, defendant's motion in limine as to that item is moot. Finally, plaintiffs agreed that "evidence of [d]efendant's financial condition should only be presented at the punitive damages stage of trial"; thus, because the Court is granting defendant summary judgment on the issue of punitive damages, the Court finds that defendant's motion in limine as to its financial status should be granted.

1.      Any Reference to the May 25, 2019 Wind and Hail Storm as a "Tornado"

Defendant argues that "[r]eferences to [a] tornado [are] . . . unduly prejudicial while lacking probative value[,]" because "[n]o evidence suggests that a tornado ever struck [p]laintiffs' house, that a tornado caused any damage to [p]laintiffs' house, or that a tornado was in any way the cause of [p]laintiffs' claim with State Farm." Id. at 9. Plaintiffs respond that the May 25, 2019 storm produced two tornados "within a short distance of [p]laintiffs' home[,] . . . [which] affected the direction of the winds, the severity of the winds, and the rotation of the winds. . . . Prohibiting the mention of the term 'tornado' would effectively eviscerate [p]laintiffs' ability to present a complete picture of their expert's opinions to the jury"; "cross-examine [d]efendant's expert; and furnish the jury with the truth about the at-issue storm." Dkt. # 37, at 9.

34

Under Fed. R. Evid. 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Further, pursuant to Rule 403, the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [and] misleading the jury."

Here, both plaintiffs' and defendant's meteorologist experts conclude that plaintiffs' home was not in the path of a tornado.  Dkt. # 37, at 8.  Plaintiffs present no evidence that their residence was damaged by a tornado.  Moreover, that there were tornados reported in other areas during the May 25, 2019 storm has very little probative value as to the extent of covered damage to plaintiffs' wood shake roof and whether defendant underpaid for plaintiffs' claim.  On the other hand, reference to a "tornado" or a "tornadic" storm runs a high risk of unfair prejudice, confusing the issues, or misleading the jury--a risk that substantially outweighs the probative value, if any, of reference to tornados that were within a few miles of plaintiffs' property.  Plaintiffs' expert can opine that the May 25, 2019 wind and hail storm had reported wind speeds in excess of 60 mph, id. at 9, without reference to tornados that did not physically touch down on plaintiffs' property.  Thus, the Court finds that defendant's motion in limine as to any reference to "tornado" should be granted.

2.     Evidence of Plaintiffs' Damages That Have Not Been Disclosed Previously

Defendant argues that, pursuant to Rule 26 disclosure requirements, "[p]laintiffs should be precluded from alleging any breach of contract damages exceeding the amount disclosed by [p]laintiffs.  Plaintiffs should also be precluded from alleging or presenting evidence that they incurred a specific amount or range of damages for [d]efendant's alleged bad faith."  Dkt. # 26, at 11.

As a preliminary matter, the Court found in Part III, <u>supra</u>, the defendant's motion for partial summary judgment as to plaintiffs' bad faith claim and the issue of punitive damages should be granted. Therefore, defendant's motion in limine as to alleging or presenting evidence regarding bad faith or punitive damages should be granted.

As to contractual damages, plaintiffs provided notice to defendant in their Rule 26 disclosures that they are seeking contractual damages in the amount of $361,518.63. <u>Id.</u> at 10. Since then, plaintiffs have, through their expert disclosures, "identified Pat Carrell as an expert 'retained to estimate and quantify the amount of damages sustained by [p]laintiffs. . . .'" Dkt. # 37, at 10. Accordingly, Mr. Carrell included in his expert report an estimate for the replacement cost value for plaintiffs' alleged damage, which was $223,106.75. Dkt. # 37-3, at 8. However, the expert report provides an estimate of the net cost of replacing plaintiffs' roof as of August 2021. <u>Id.</u> at 1. The estimate does not, for example, reflect the replacement cost value of plaintiffs' roof in 2022, which would account for inflation and other circumstances that may influence the actual cost of replacing plaintiffs' roof. Notwithstanding, the expert report provides defendant with adequate notice--for purposes of Rule 26 disclosures--of the approximate amount of actual damages plaintiffs seek for their breach of contract claim. Therefore, the Court finds that defendant's motion in limine should be denied as to plaintiffs alleging contract damages that exceed the amount disclosed in their Rule 26 disclosures.

### 3.      Any Reference to State Farm's Advertising, Mottos, or Slogans

Defendant argues that the "use of State Farm's slogan(s) or spokespersons have no probative value and would be designed solely to unfairly prejudice the jury against State Farm." Dkt. # 26, at 11. Plaintiffs respond that defendant "has embedded its company slogan and motto into its claims

handling department . . . Thus, the representations and assuring slogans [defendant] fully embraced and utilized to sell [plaintiffs an insurance policy] are relevant in this action and are an inherent part of the duty" to act in good faith and deal fairly with plaintiffs.  Dkt. # 37, at 14-16.

The Court found in Part III, supra, that defendant's motion for partial summary judgment on plaintiffs' bad faith claim should be granted.  Here, plaintiffs argue that State Farm's advertising, slogans, and mottos are relevant to their bad faith claim, which is no longer at issue in this case.  Moreover, State Farm's advertising, slogans, and mottos have no relevance as to plaintiffs' breach of contract claim; i.e., State Farm's advertising, slogans, or mottos have no tendency to make a fact of consequence more or less probable with respect to whether plaintiffs' roof damage entitles them to the full replacement cost value of a total roof replacement under the policy.  See Fed. R. Evid. 401.  Therefore, defendant's motion in limine as to testimony regarding or referencing any of State Farm's advertising, mottos, or slogans should be granted.

4.      Mention of the Unfair Claims Settlement Practices Act

Defendant argues that Oklahoma law "recognizes that it is *improper* for a jury to consider the [Unfair Claims Settlement Practices Act (UCSPA)]."  Dkt. # 26, at 13 (emphasis in original).  Plaintiffs respond that defendant's motion should be denied "because the UCSPA is informative to [p]laintiffs' bad faith claim and provides guidance regarding the same[.]" Dkt. # 37, at 17.  The Court finds that, because plaintiffs' bad faith claim is no longer at issue, defendant's motion should be granted.

5.      Argument as to State Farm Having a Fiduciary Duty

Defendant argues that plaintiffs "have asserted a claim for a violation of the duty of good faith and fair dealing, *not* a breach of fiduciary duty. . . . Accordingly, [p]laintiffs should be

precluded from alleging State Farm had a fiduciary duty." Dkt. # 26, at 14-15.  The Court agrees. Plaintiffs' response is rooted in defendant's implied duty of good faith and fair dealing, see Dkt. # 37, at 17-18, and the Court granted summary judgment on plaintiffs' bad faith claim.  Moreover, breach of a fiduciary duty is a claim that is distinct from breach of the duty of good faith and fair dealing.  See Cosper v. Farmers Ins. Co., 309 P.3d 147, 150 (Okla. Civ. App. 2013) ("the existence of the duty of good faith and fair dealing implied in insurance contracts does not necessarily mean [p]laintiffs' petition states a claim for breach of fiduciary duty").  Therefore, any reference to State Farm having a fiduciary duty is 1) not relevant to plaintiffs' breach of contract claim; and 2) would impermissibly prejudice State Farm by creating a risk of confusing the issues or misleading the jury. Accordingly, the Court finds that defendant's motion in limine as to any reference to State Farm having a fiduciary duty should be granted.

6.      Any Reference to Punitive Damages or Punishing State Farm

In Part III, supra, the Court granted defendant's motion for partial summary judgment as to the issue of punitive damages.  Accordingly, any reference to punitive damages or punishing defendant is 1) not relevant to plaintiffs' breach of contract claim; and 2) risks unfair prejudice to defendant due to confusing the issues or misleading the jury.  Therefore, the Court finds that defendant's motion in limine as to punitive damages and punishing State Farm is granted.

7.      Golden Rule Arguments

Defendant moves to preclude any golden rule arguments, which are "universally recognized as improper, because [they] encourag[e] the jury to depart neutrality and to decide the case on the basis of personal interest and bias rather than evidence."  Dkt. # 26, at 16 (internal quotations omitted).  Plaintiffs respond that they agree with defendant that golden rule arguments should not

be permitted at trial.  Dkt. # 37, at 19.  However, plaintiffs argue that defendant has "expanded the meaning of a 'golden rule argument' by utilizing examples that reach beyond simply asking a jury to place themselves in the shoes of a named party"; for example, "[d]efendant seeks to prohibit [p]laintiffs from asking the jury 'to consider what they would want if this was their family or their home[.]"  Id.  According to plaintiffs, they should be permitted to ask the jury to consider its community; that such a request is not asking members of the jury to put themselves in the shoes of a party.  Id.  The Court finds plaintiffs' argument nonsensical--asking the jury to consider what if it was their family or their home or community is exactly the kind of golden rule argument that impermissibly invites the jury to decide a case based upon personal interest and bias, see Burke v. Regalado, 935 F.3d 960, 1030-31 (10th Cir. 2019).  Thus, the Court finds that defendant's motion in limine as to golden rule arguments should be granted, which includes asking members of the jury to consider if it were their family, their home, their community, and so forth.

8.     Statements or References to Discovery, Motions, or Pretrial Disputes

Defendant argues that "[a]ny reference to discovery motions, discovery disputes, or other disputes is not relevant to the merits of this case."  Dkt. # 26, at 17.  Plaintiffs respond that although they "do not generally object to [d]efendant's motion[,]" plaintiffs request that the Court reserve its ruling until trial and that it is "unnecessary to make a blanket prohibition at this time[.]"  Dkt. # 37, at 19-20.  The Oklahoma Court of Civil Appeals has found that "an insurer's litigation tactics and strategy in defending a claim are not relevant to the insurer's decision to deny coverage[.]"  Sims v. Travelers Ins. Co., 16 P.3d 468, 471 (Okla. Civ. App. 2000).  In other words, defendants litigation conduct, including discovery motions, discovery disputes, etc. are not relevant to plaintiffs' breach of contract claim.  The Court fails to see how the passage of time would make defendant's litigation

conduct more or less relevant to plaintiffs' breach of contract claim, and plaintiffs cite to no authority supporting their position.  Notwithstanding, the Court reminds plaintiffs that rulings on motions in limine are preliminary and "subject to change when the case unfolds[.]"  Luce v. United States, 469 U.S. 38, 41 (1984).  In sum, the Court finds that defendant's motion in limine as to statements or references to discovery, motions, or pretrial disputes should be granted.

        9.      Reference to Settlement Discussions, Proposals, or Any Offer of Judgment

        Defendant moves, pursuant to Fed. R. Civ. P. 68 and Fed. R. Evid. 408, to preclude reference to any settlement discussions, proposals, or offer of judgment at trial.  Dkt. # 26, at 18.  Under Fed. R. Civ. P. 68, "evidence of an unaccepted offer is not admissible except in a proceeding to determine costs."  Further, under Fed. R. Evid. 408, reference to settlement discussions and negotiations is not admissible "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction"; however, the Court "may admit this evidence for another purpose, such as proving a witness's bias or prejudice, [or] negating a contention of undue delay."  The Court fails to see how any settlement discussions, proposals, or offers of judgment are relevant to plaintiffs' breach of contract claim, and plaintiffs cite to no authority or analogous cases where a court found that settlement discussions, proposals, or offers of judgment were relevant to an insurance breach of contract claim.  Therefore, the Court finds that defendant's motion in limine as to any reference to settlement discussions, proposals, or offers of judgment should be granted.

        10.    Mr. Cannon's Testimony and the Rule Against Hearsay

        Defendant seeks to exclude as hearsay "any testimony by Mr. Cannon as to what he was told by the [p]laintiffs, or what he relied upon from [p]laintiffs, or what he was told by others[.]" Dkt. # 26, at 19.  The Court finds that ruling on the admissibility of certain parts of Mr. Cannon's

potential testimony is premature at this stage.  It is possible that certain hearsay statements fall within an exception to the rule against hearsay, and the Court will not speculate as to the context in which plaintiffs' will offer certain statements during Mr. Cannon's testimony; however, defendant may make any well-founded objections at trial.  Thus, the Court finds that defendant's motion in limine to exclude as hearsay Mr. Cannon's testimony as to what he was told by plaintiffs, what he relied upon from plaintiffs, or what he was told by others should be preliminarily denied without prejudice.

11.     Non-Expert Testimony and Hearsay Statements Related to Causation

Defendant requests that the Court exclude "[a]ny opinions from *lay witnesses* (non-experts) that [p]laintiffs' roof was damaged from the storm or must be replaced because of the storm, or any testimony containing conclusions about the nature and extent of damage to [p]laintiffs' house." Id. at 19-20.  Defendant further requests that "to the extent [p]laintiffs seek to introduce evidence either through one of the [p]laintiffs, or another witness . . . testimony that would otherwise be excluded-- for example, testimony that the roof needed to be repaired or that the damage to the roof was because of a storm on May 25, 2019." Id. at 20.

As the Court found in Part IV.c, supra, lay witnesses may testify to facts and opinions of which they have personal knowledge, including particularized knowledge based on their respective professional experience and background.  See Fed. R. Evid. 701; Fed. R. Evid. 701 advisory committee's note to 2000 amendments.  The Court finds that defendant's motion is overly broad and speculative.  For example, Mr. Avila can opine, based on his inspection of plaintiffs' roof and his background as a roofing contractor, that plaintiffs' roof was damaged or deteriorated and required replacement.  As the Court already distinguished, Mr. Avila cannot testify that plaintiffs' roof was damaged by the May 25, 2019 storm, because he lacks the requisite personal knowledge to form such

an opinion as a lay witness.  As an additional example, if Mr. Avila observed hail impact marks to plaintiffs' wood shake roof, he can testify to what he saw, and why he believes that is what he saw. As for plaintiffs' potential attempts to elicit otherwise inadmissible testimony through plaintiffs or another witness, the Court will not speculate as to the context in which plaintiffs will offer certain statements at trial. It is possible that certain hearsay statements fall within an exception to the rule against hearsay.  In sum, the Court finds that defendant's motion in limine as to non-expert testimony and hearsay statements should be denied as overly broad and speculative; however, defendant may make any well-founded objections at trial.

12.   Any Statements or References That Companies Are Generally "Bad"

Defendant requests that the Court preclude plaintiffs from making "[s]tatements or references that, generally, companies are bad[,]" because such statements or references "are irrelevant and could only serve to confuse and mislead the jury, creating unfair prejudice." Dkt. # 26, at 20.  Plaintiffs respond that they "should not be censored from referring to [d]efendant as a 'large corporation,' and rulings on other verbiage relating to [d]efendant's company should be reserved for trial." Dkt. # 37, at 23.  Plaintiffs have responded to several of defendant's motions in limine arguing that the Court should not "censor" plaintiffs by preventing them from making certain arguments or statements, see, e.g., id. at 14, 21, 23; however, plaintiffs' understanding of censorship is misguided.  The purpose of the Federal Rules of Evidence is not to suppress offensive content,[8] but to help ensure that "every proceeding [is administered] fairly . . . to the end of ascertaining the truth and securing a just

---

[8]     Merriam-Webster dictionary defines the verb "censor" as "to suppress or delete as objectionable[.]"  Censor, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/censor. Merriam-Webster dictionary defines "objectionable" as "undesirable" or "offensive[.]" Objectionable, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/objectionable.

determination." Fed. R. Evid. 102.  Rules governing relevance and limiting unfair prejudice are in service of ascertaining the truth and securing a just determination--i.e. ensuring that a jury decides a case based on the evidence presented at trial, rather than on an emotional or otherwise biased basis. See, e.g., Fed. R. Evid. 403.

Here, the Court finds that any argument that lends itself to the inference that companies are generally bad 1) is not relevant to the extent of covered roof damage and the amount owed under the policy; and 2) invites the jury to make a decision based on impermissible bias, resulting in unfair prejudice.  Therefore, the Court finds that defendant's motion in limine as to precluding any statements or references that convey that companies are generally bad is granted.

13.    Any Reference to Bad Faith or That State Farm Acted in Bad Faith

Defendant requests that, if the Court grants defendant's motion for partial summary judgment on plaintiffs' bad faith claim, "any reference to a covenant of good faith and fair dealing, or an alleged breach of the covenant, or to any alleged act of bad faith by State Farm" be precluded.  Dkt. # 26, at 22.  In Part III, supra, the Court found that defendant's motion for partial summary judgment on plaintiffs' bad faith claim should be granted.  Accordingly, the Court finds that any statements or argument as to bad faith, the covenant of good faith and fair dealing, and so forth is relevant to a bad faith claim only.  In other words, any alleged acts of bad faith or reference to the implied covenant of good faith and fair dealing are not relevant to plaintiffs' breach of contract claim--such topics are not relevant to the extent of covered roof damage and the amount owed under the terms of the policy.  Thus, the Court finds that defendant's motion in limine as to any reference to bad faith, the covenant of good faith and fair dealing, and any breach of the covenant of good faith and fair dealing should be granted.

**IT IS THEREFORE ORDERED** that defendant's motion for partial summary judgment (Dkt. # 22) is **granted** as to plaintiffs' bad faith claim (count 2) and the issue of punitive damages.

**IT IS FURTHER ORDERED** that defendant's motion to exclude Carl E. Martin (Dkt. # 25) is **granted**.

**IT IS FURTHER ORDERED** that plaintiffs' motion to exclude defense expert Jon Derek VanDorn (Dkt. # 27) is **denied in part** as to excluding Mr. VanDorn's testimony, and **granted in part** as to limiting Mr. VanDorn's testimony in accordance with this opinion and order.

**IT IS FURTHER ORDERED** that defendant's motion to exclude or limit plaintiffs' non-retained experts (Dkt. # 24) is **denied in part** as to excluding Mr. Cannon, and **granted in part** as to limiting Mr. Cannon's and Mr. Avila's testimony as lay witnesses in accordance with this opinion and order.

**IT IS FURTHER ORDERED** that defendant's omnibus motion in limine (Dkt. # 26) is **granted in part**, **moot in part**, and **denied in part** in accordance with this opinion and order.

**DATED** this 17th day of May, 2022.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE